**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| **TOD DAVIS,**<br>individually and on behalf of all others similarly situated,<br>*Plaintiff,*<br>v.<br>**HAMILTON HEALTH CARE SYSTEM, INC. d/b/a VITRUVIAN HEALTH,** a not-for-profit corporation organized under the laws of Georgia,<br>*Defendant.* | Case No.<br>4:26-cv-00338-WMR |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Tod Davis ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Defendant Hamilton Health Care System, Inc., d/b/a Vitruvian Health ("Vitruvian Health," "Vitruvian," or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1. This is a class action lawsuit arising from Vitruvian Health's collection and disclosure of Website visitors' sensitive personal health

information and electronic communications to third parties, including Google and Simpli.fi, without prior notice and consent, through tracking mechanisms embedded in the Vitruvian Health website at vitruvianhealth.com (the "Website").

2. Defendant, which does business as Vitruvian Health (formerly branded as Hamilton Health Care System), is a healthcare system based in Dalton, Georgia. The organization provides healthcare services across northwest Georgia and southeast Tennessee. Through its Website, Vitruvian Health allows visitors to search for providers by name, specialty, or condition; browse healthcare services and locations; access patient resources; use links to the MyChart patient portal (the "Patient Portal"); request medical records; pay bills; and obtain information regarding Vitruvian Health's clinical programs and healthcare offerings.

3. Unbeknownst to Website visitors, Vitruvian has knowingly implemented tracking technologies owned by Google and Simpli.fi on the Website: the Google Analytics Tracker and the Simpli.fi Tracker (collectively, the "Trackers"). When Website visitors search for providers, browse healthcare services, search for clinic and hospital locations, access the Patient

Portal, or interact with other health-related content, Google and Simpli.fi, through the Trackers, intercept the contents of these electronic communications in real time, and Vitruvian Health discloses those contents to Google and Simpli.fi, without consent. This includes the interception of: (a) users' searches for medical providers; (b) users' searches for medical services; (c) users' searches for medical facilities and clinic locations; (d) users' free-text search queries entered into the Website's search bar; and (e) users' clicks to access the Patient Portal (MyChart). Google and Simpli.fi then utilize the collected personal data to enhance their advertising technologies and potentially target individuals with marketing based on their sensitive health information and website interactions.

4. By embedding the Trackers in its Website, Vitruvian Health disclosed Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to Google and Simpli.fi without prior and specific informed consent.

5. Vitruvian Health's disclosure of the contents of these intercepted private electronic communications, which occurs without appropriate notice to

visitors and without obtaining their consent, amounts to or results in (1) a violation of the federal Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. ("ECPA"); (2) a breach of confidence; (3) an invasion of privacy; (4) unjust enrichment; and (5) a breach of implied contract.

6. Through this action, Plaintiff seeks to remedy these harms and bring causes of action to hold Vitruvian accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent Defendant's continued disclosure of Website visitors' intercepted electronic communications to third parties.

## PARTIES

7. Plaintiff Tod Davis is a natural person who resides in Chatsworth, Georgia, and is a citizen of Georgia, where he intends to remain.

8. Defendant Hamilton Health Care System, Inc., d/b/a Vitruvian Health, is a not-for-profit corporation organized under the laws of Georgia, headquartered at 1200 Memorial Drive, Dalton, Georgia. Defendant operates the Website at issue in this litigation.

9. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d and 45 C.F.R. Parts 160–164.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a state different from Defendant.

11. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the ECPA (18 U.S.C. § 2510 *et seq*.).

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

13. This Court has personal jurisdiction over Defendant because its principal place of business is in Georgia, it conducts substantial business

operations in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

14. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant's principal place of business is in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### *A. Federal Regulators Make Clear that the Use of Tracking Technologies to Collect and Divulge Private Information Without Informed Consent is Illegal*

15. The surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue.

16. Defendant is a health care entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services ("HHS") promulgated "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Privacy Rule, no health care provider can disclose a person's protected health information to a third party for

purposes the Privacy Rule does not permit, such as marketing, without the person's written authorization. See 45 C.F.R. § 164.508(a). The Office for Civil Rights ("OCR") at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "Bulletin"), that the unlawful transmission of such protected information violates the Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[1]

17. The HHS Bulletin does not change any existing rule or impose any new obligation on HIPAA-covered entities. Instead, it reminds these entities of their long-standing obligations by referring to guidance and rules that have been in place for decades. ("it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors").[2]

---

[1] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added).
[2] *Id.*

18. In recent years, both the Federal Trade Commission ("FTC") and the HHS Office for Civil Rights have reiterated the importance of and necessity for data security and privacy concerning health information.

19. For instance, the FTC has engaged in numerous enforcement actions against companies operating health-related apps or websites.[3]

20. In 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google, and Criteo.[4]

---

[3] *See, e.g.*, *United States v. Easy Healthcare Corp.*, No. 1:23-cv-3107 (N.D. Ill. June 22, 2023); *In the Matter of BetterHelp, Inc.*, No. C-4796 (FTC July 7, 2023); *United States v. GoodRx Holdings, Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 17, 2023); *In the Matter of Flo Health, Inc.*, No. C-4747 (FTC June 17, 2021); *see also* Jill Hughes, *How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, Healthtech Security (TechTarget) (May 2, 2023), https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy (last visited October 20, 2026).

[4] *United States v. GoodRx Holdings, Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 17, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), https://www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger

21. Another FTC enforcement action against online counseling service BetterHelp resolved in a $7.8 million settlement based on allegations that the company shared customer health data with Facebook and Snapchat.[5]

22. Meanwhile, the FTC submitted a stipulated order requiring Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premom shared health data for advertising purposes.[6]

---

scale.") (last visited October 20, 2026).

[5] *In the Matter of BetterHelp, Inc.*, No. C-4796 (FTC July 7, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter (last visited October 20, 2026); *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, FTC (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising (last visited October 20, 2026).

[6] *United States v. Easy Healthcare Corp.*, No. 1:23-cv-3107 (N.D. Ill. June 22, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v (last visited October 20, 2026); *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, FTC (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc (last visited October 20, 2026).

23. In July 2023, federal regulators sent a letter to 129 health care providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned that "[i]mpermissible disclosures of an individual's personal health information to third parties" could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[7]

24. Federal regulators also warned that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible

[7] Letter from Melanie Fontes Rainer, Director, Office for Civil Rights, U.S. Dept. of Health and Human Servs. & Samuel Levine, Director, Bureau of Consumer Protection, Federal Trade Comm., to 129 health care providers (July 20, 2023), https://www.hhs.gov/sites/default/files/ocr-ftc-letters-re-use-online-tracking-technologies.pdf (last visited October 20, 2026).

disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."[8]

25. Moreover, the HHS Office for Civil Rights has made clear, in a bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "Bulletin"), that the transmission of protected health information violates the Privacy Rule:

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[9]

26. The Bulletin points out the harms that impermissible disclosure of an individual's PHI may cause patients, such as:

---

[8] *Id.*

[9] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept. of Health and Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (footnotes omitted) (last visited October 20, 2026) (vacated in part by *Am. Hosp. Ass'n v. Becerra,* 738 F. Supp. 3d 780 (N.D. Tex. 2024), only to the extent that HIPAA obligations are triggered where online technology connects an IP address with an unauthenticated webpage addressing specific health conditions or healthcare providers).

> identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[10]

### *B. Industry Standards Dictate that Protecting Patient Data and Communications is the Duty of Health Care Companies*

27. A medical provider's duty of confidentiality is a cardinal rule embedded in the physician-patient and hospital-patient relationship.

28. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

29. AMA Code of Medical Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

30. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing

[10] *Id.*

> information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity) about the purposes for which access would be granted.

31. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must… release patient information only in keeping with ethics guidelines for confidentiality.

### *C. Overview of Website Tracking on Healthcare Websites*

32. Some websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become increasingly sophisticated, evolving from simple cookies to complex tracking systems that can monitor detailed user behavior across websites and devices.

33. Website tracking technologies typically function by placing small pieces of code on websites that are downloaded to a user's browser when they visit the site. This code enables the collection of various types of data about

the user's interactions with the website, which is then transmitted to third-party servers for processing and storage.

34. The most basic form of website tracking involves cookies, which are small text files stored on a user's device that contain information about their browsing activity. First-party cookies are placed by the website the user is visiting directly, while third-party cookies are placed by domains other than the one the user is visiting. These third-party cookies enable tracking across multiple websites and are commonly used for advertising and analytics purposes.

35. JavaScript-based trackers represent a more sophisticated tracking method. Website owners implement these trackers by embedding JavaScript code snippets into their website's source code. When a user loads a webpage containing such code, the tracker is downloaded onto the user's browser, where it activates and collects data about user behavior, which is then transmitted to the tracker provider's servers in real time.

36. The interception of healthcare-related communications through these tracking technologies is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, and care-

seeking behaviors to third parties without patients' knowledge or explicit consent.

37. As detailed in this Complaint, Defendant has implemented such tracking technologies on the Website, resulting in the unauthorized interception of visitors' electronic communications by Google and Simpli.fi.

***D. The Google Analytics Tracking Technology***

38. Google LLC ("Google") is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating hundreds of billions of dollars in revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, including Google Search, Gmail, YouTube, and Android, which it then leverages to deliver targeted advertisements.

39. The Google Analytics 4 Tracker ("Google Analytics Tracker") is a web analytics service offered by Google that allows website owners to track visitors' actions on their website in order to gain insights into user behavior and to target them with personalized advertisements. Defendant has implemented the Google Analytics Tracker on its Website.

40. The Google Analytics Tracker is a JavaScript-based tracking technology developed by Google. Website owners or administrators implement the Tracker by adding a snippet of JavaScript code to their website, typically in the header section of the site's code.

41. Once implemented, the Google Analytics Tracker loads automatically and immediately whenever a user visits a page containing its source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms and the interception of their communications by Google. The surreptitious nature of the Google Analytics Tracker means that users typically have no idea that their electronic communications are being intercepted by third parties like Google.

42. The Google Analytics Tracker intercepts and collects various data points about user interactions with a website, which it calls "events," and transmits details of these events to Google. These events include page views,

clicks, form submissions, video plays, file downloads, and custom events defined by the website owner.

43. When a user accesses the Website while logged into a Google Chrome browser or signed into their Google account (such as Gmail or YouTube), Google has already assigned unique identifiers to that user through third-party cookies including 3PSID, 3PAPISID, and 3PSIDCC. These cookies are set by Google services (such as google.com) and are explicitly tied to the user's logged-in Google account. The values of these cookies are unique to each account holder and persist across sessions and devices as long as the user remains signed in. When the Google Analytics Tracker transmits data about a user's activity on the Website to Google's servers, the user's browser automatically includes these cookies in the transmission, enabling Google to associate the intercepted health information with the user's identified Google account.

44. When creating a Google account, users are required to provide an email address, meaning that data collected alongside the 3PSID, 3PAPISID, and 3PSIDCC cookies (such as user communications on the Website) can be linked by Google to an identifiable email address. Many users also voluntarily

provide additional identifying information to Google such as their full name, phone number, home address, work address, profile photograph, and recovery email. As a result, Google can associate the data collected alongside the cookies not only with an email address, but also with a named and potentially highly personalized user profile. This enables Google to link a user's private activity on a website such as Defendant's to their name and broader aspects of their digital identity, particularly when combined with other data collected across Google's ecosystem, such as Gmail usage, YouTube views, or Google Maps history.

45. Once the Google Analytics Tracker intercepts and processes the raw user data about "events," which may include personal and sensitive health-related information, it uses the 3PSID, 3PAPISID, and 3PSIDCC cookies to associate this data with unique user identifiers, from which it can link website interactions to individual user profiles and track users across multiple different websites, sessions, and devices when signed into their Google accounts. After the data has been processed and subsequently stored in the Google database, Google uses the data to generate reports to help analyze the data intercepted. Those reports include reports on acquisition

(e.g., information about where the traffic originated and the methods by which users arrived at a site), engagement (what web pages a user visited), and demographics (a user's age, location, language, gender, and interests expressed when browsing online and engaging in purchase activities).

46. The Google Analytics Tracker can also set a different type of cookie, known as the NID cookie. The NID cookie is tied to the user's browser rather than to a named account. It still contains a unique identifier that persists for approximately six months, unless a user manually "clears" their cookies (Google will then automatically generate a new, unique identifier associated with the NID cookie). The NID cookie enables Google to track user preferences, browsing behavior, and ad interactions across websites that use Google Analytics or serve Google Ads where a user is not signed into a Google account on that browser. While the NID cookie does not reveal a named account identity, it still allows Google to build behavioral profiles and serve personalized advertisements based on a user's activity, including activity on websites such as Vitruvian Health's. Google's Privacy Policy expressly acknowledges its practice of tracking users, even when they are not logged in, via sites that have installed the Google Analytics Tracker. Per Google's own

statement: "[w]hen you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This allows us to do things like maintain your preferences across browsing sessions, such as your preferred language or whether to show you more relevant search results or ads based on your activity across devices."[11]

47. In addition to accessing and using the data intercepted from website users to provide its services, Google also uses the information intercepted by sites like Defendant's to maintain and improve Google's own services, develop new services, measure the effectiveness of its advertising, and personalize content and ads that one sees on Google's and its partners' sites and applications. When combined with Google's vast data resources from its other products and services, Google Analytics data can contribute to comprehensive profiles of individuals that can be used for targeting advertisements and other commercial purposes.

[11] *See* Google, *Privacy Policy*, https://policies.google.com/privacy/embedded?hl=en-US (last visited October 20, 2026).

### *E. The Simpli.fi Tracking Technology*

48. Simpli.fi, Inc. ("Simpli.fi") is a digital advertising and technology company that provides advertising, retargeting, and data collection services through its tracking technology. Simpli.fi's business model centers on collecting, consolidating, and leveraging consumer data to deliver targeted marketing and advertising on the internet. Defendant has implemented the Simpli.fi Tracker on the Website.

49. Website owners or administrators implement the Simpli.fi Tracker by embedding a JavaScript tag or script resource into their website's source code. This implementation requires the website administrator to add the provided code to the website, enabling data transmissions to servers controlled by Simpli.fi, including the dedicated tracking and data collection endpoint at tag.simpli.fi.

50. Once implemented, the Simpli.fi Tracker loads automatically and immediately whenever a user visits a page containing its source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or

use specialized browser tools might detect the presence of these tracking mechanisms and the interception of their communications by Simpli.fi. The surreptitious nature of the Simpli.fi Tracker means that users typically have no idea that their electronic communications are being intercepted by third parties like Simpli.fi.

51. Through this implementation, the Simpli.fi Tracker intercepts and collects various data points about user interactions with the Website. The data transmitted includes the Referer header containing the URL of the page visited, which can reveal the specific content accessed by the user. Additional data transmitted includes information about a user's device and their visits to websites and apps, including the browser type and version, operating system, Internet service provider (ISP), and referring/exit pages. This data collection encompasses date/time stamps, clickstream data, and information regarding a user's online activities over time and across non-affiliated websites or multiple devices.

52. Simpli.fi further captures specific identifiers that may be considered personal information, such as IP addresses, cookie identifiers, and mobile advertising identifiers, and may also receive Precise Location Data to

facilitate geolocation services like GeoFencing. Website operators may configure the Simpli.fi Tracker to transmit additional event parameters through Data Mapping, a configuration process where website operators manually select specific data points from their site to transmit to Simpli.fi, reflecting specific user actions. Operators can map custom user behaviors to variables such as “action” or “segment,” which allows the tracker to go beyond standard page views and capture specific “online actions” defined by the operator to measure engagement and conversions.

53. To enable persistent recognition of users, the Simpli.fi Tracker sets and accesses unique cookie identifiers stored in the user’s browser or device. These identifiers include: (a) the suid cookie, a persistent, browser-based cookie used to uniquely identify a user’s device to track browsing behavior and support interest-based profiling and advertising; and (b) the uid_syncd_secure cookie, a persistent, browser-based cookie used to facilitate and signal secure identifier synchronization with third-party advertising partners (collectively with the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, the “Cookies”).

54. The Simpli.fi Tracker also collects and stores IP addresses in server logs. An IP address is a globally unique numerical identifier that guides or routes communications across the internet. Internet Service Providers assign IP addresses to networking devices such as modems or routers.

55. IP addresses function as the essential addressing system of the internet. Just as a telephone number routes calls to the correct household, an IP address is necessary for routing internet communications to the correct location. Importantly, IP addresses reveal the general geographic location of internet users. Free online "IP lookup" services use databases that map IP addresses to geographic areas and potentially specific households, often providing information about the country, city, county, approximate coordinates, or even the internet service provider associated with the address.

56. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking. IP addresses allow companies to target advertisements to users in specific geographic areas with great accuracy and track user interactions across multiple websites, building detailed profiles of users' browsing habits tied to their location.

57. IP addresses are particularly powerful when combined with persistent identifiers such as cookies. When individuals use their devices across different locations (home, work, coffee shops), each location has its own IP address. By tracking these movement patterns between different IP addresses and correlating them with a cookie, Simpli.fi can build detailed profiles of individual users' daily routines and behaviors that distinguish them from others who may share the same IP address. This combination of cookies and IP address patterns allows Simpli.fi to identify and track specific individuals with remarkable precision, even when multiple people share the same household or workplace network.

58. For these reasons, Europe's General Data Protection Regulation ("GDPR") classifies IP addresses as "personal data," recognizing that even data that has been de-identified or pseudonymized but can be used to re-identify a person remains personal data. When Simpli.fi combines IP addresses with the suid and the uid_syncd_secure cookies and the sensitive health information intercepted from the Website, it can create a comprehensive digital profile that can identify specific individuals and their medical interests.

59. The collected information is used by Simpli.fi for purposes associated with its provision of programmatic advertising services, including interest-based advertising, targeting and delivering advertisements, and reporting and analytics. Over time, repeated transmissions associated with the same identifier enable Simpli.fi to develop a longitudinal record of user activity across sessions and, where the Tracker is deployed across multiple websites or services, across contexts.

60. Upon information and belief, Simpli.fi combines the sensitive health information intercepted through its Tracker with other data points in its possession to create comprehensive user profiles that include intimate details about individuals' medical conditions, treatment interests, and healthcare-seeking behaviors. These profiles can then be monetized through targeted advertising that may reveal or allude to users' private health concerns.

### *F. Visitors to the Website Reasonably Expect Their Information to Stay Private*

61. Vitruvian Health operates the Website as an extension of its healthcare services, facilitating patient care and providing healthcare

information. The Website allows users and patients to search for providers by name, specialty, or condition; browse healthcare services including emergency care, heart and vascular care, orthopedics, behavioral health, women's health, primary and walk-in care, cancer care, and other medical specialties; search for clinic and hospital locations; access the Patient Portal via MyChart links; request medical records; pay bills; and access other healthcare-related resources.

62. When using these online services, visitors input medical information, including private and confidential information regarding medical conditions and treatment, with the reasonable expectation that such information will be kept confidential and used only for legitimate healthcare purposes.

63. Users of the Website reasonably expect that their communications and activities will remain private, particularly given Vitruvian Health's status as a healthcare provider subject to HIPAA and other privacy regulations, as well as professional and ethical obligations to protect patient confidentiality.

64. This expectation of privacy is reinforced by longstanding regulatory principles and enforcement actions in the healthcare sector.

Federal privacy regulations have long recognized that protected health information extends beyond diagnosis-specific information. In 2013, HHS clarified through formal rulemaking that information need not contain specific medical terms to be protected under HIPAA: if it "is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity." 78 Fed. Reg. 5566, 5598 (Jan. 25, 2013).

65. Defendant's conduct described in this Complaint is in violation of HIPAA, which imposes criminal penalties for knowingly disclosing individually identifiable health information ("IIHI") to third parties. 42 U.S.C. § 1320d-6(a)(3). HIPAA defines IIHI as "any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider . . . (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1320d(6). Moreover, IP

addresses are considered PHI when connected to treatment records or other protected information under HIPAA.[12]

66. Defendant intended to share its patients' IIHI, which is in violation of HIPAA and common law duties. Defendant's actions described herein violated federal law governing the protection of health information.

67. In 2023, the Federal Trade Commission and the U.S. Department of Health and Human Services Office for Civil Rights warned healthcare providers about their obligations to protect against impermissible disclosures of personal health information through web-tracking technologies such as the Trackers discussed in this Complaint, emphasizing that unauthorized disclosure of such information through trackers can violate federal law.[13]

68. This expectation of privacy is also fundamental to the physician-patient relationship and extends to all healthcare communications, including those conducted through healthcare providers' websites.

69. Users would not reasonably expect that simply by visiting the Website to search for providers, explore medical facilities, research treatment

---

[12] *See supra* note 1.
[13] *See supra* note 5.

options, or visit the patient portal, their sensitive health information would be intercepted by third parties like Google and Simpli.fi for purposes unrelated to their healthcare needs.

### *G. Defendant's Implementation of the Trackers*

70. Vitruvian Health has deliberately implemented the third-party Google Analytics Tracker and Simpli.fi Tracker in the source code of the Website, thereby disclosing to Google and Simpli.fi, without proper consent, the sensitive health information and electronic communications of its patients and Website visitors, which Google and Simpli.fi intercept in real time.

71. The Trackers operate on pages of the Website where users search for providers, browse medical services, locate treatment facilities, access the Patient Portal, and conduct health-related searches. They operate invisibly to Website visitors, who have no meaningful way of knowing that their sensitive health queries and browsing behaviors are being intercepted by third parties.

72. The information intercepted through these Trackers by Google and Simpli.fi includes, but is not limited to, Plaintiff's and the Class Members': (1) searches for providers by specialty, such as Obstetrics & Gynecology, and by individual provider name; (2) searches for medical services, such as

Behavioral Health; (3) searches for clinic and hospital locations, such as the Bandy Endoscopy Center; (4) free-text search queries for specific medical conditions entered into the Website's search bar, including searches for "cancer" and "Anal and Rectal Cancer"; (5) clicks to access the Patient Portal (MyChart); and (6) every page URL visited by users on the Website. When combined with persistent identifiers (the Cookies), this information allows Google and Simpli.fi to identify individual users and associate sensitive health information with their digital profiles.

73. The persistent identifiers used by the Trackers create digital fingerprints that allow Google and Simpli.fi to track individuals across multiple devices and browsing sessions, connecting their healthcare inquiries to broader online activities.

74. Upon information and belief, in addition to the Google Analytics Tracker and the Simpli.fi Tracker, Vitruvian Health has implemented or caused to be implemented other third-party tracking technologies on the Website that similarly intercept visitors' electronic communications and sensitive health information without consent. The full nature and extent of all tracking technologies deployed on the Website, the third parties receiving

intercepted data, and the categories of information transmitted are known to Defendant and can only be fully determined through discovery.

75. Upon information and belief, Google combines this intercepted healthcare-related data with information from its other services, creating comprehensive user profiles that include sensitive health information that can be used for targeted advertising and other commercial purposes. Similarly, Simpli.fi combines intercepted data with its own advertising data to build longitudinal records of user activity and comprehensive advertising profiles.

76. The information captured and disclosed to Google and Simpli.fi through the Trackers constitutes sensitive personal health information and personally identifiable data. Through the collection of the Cookies (which function as persistent unique identifiers) alongside specific healthcare-related website interactions, Google and Simpli.fi receive sufficient information to identify individual users and connect their sensitive health-seeking behaviors to their digital profiles.

77. Upon information and belief, Google and Simpli.fi can and do combine this healthcare-related personal data with data from their other services and products, creating detailed profiles that include sensitive

personal data and health information linked to identifiable individuals, which can then be used for personalized and targeted advertising.

78. As demonstrated in the following examples, Google and Simpli.fi intercept sensitive personal health data, and Defendant discloses that data to them, without obtaining the consent required by the ECPA.

### *H. Examples of Personal Data Collection and Disclosure on the Website*

79. ***Provider Searches:*** The Website allows users to search for a provider based on name, specialty, or condition. When a user searches for a provider, such as one who specializes in Obstetrics & Gynecology, the user's search, including applicable filters and provider specialty, is automatically intercepted and transmitted in real time to Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, and to Simpli.fi via the Simpli.fi Tracker, alongside the suid and uid_syncd_secure cookies and the user's IP address. Vitruvian Health thereby discloses to Google and Simpli.fi the specific medical specialty the user is searching for.

80. When the user then proceeds to a specific provider's page, such as the page for Eric Calfee, MD, the user's visit to that individual provider's page

is likewise intercepted and transmitted in real time to Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, and to Simpli.fi via the Simpli.fi Tracker, alongside the suid and uid_syncd_secure cookies and the user's IP address. Vitruvian Health thereby discloses to Google and Simpli.fi the specific healthcare provider the user is considering for care.

81. ***Healthcare Service Searches:*** The Website shares users' searches for medical services with third parties. When a user selects a service from the "Services" section of the Website, such as Behavioral Health, the fact that the user has viewed the Behavioral Health page is automatically intercepted and transmitted in real time to Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, and to Simpli.fi via the Simpli.fi Tracker, alongside the suid and uid_syncd_secure cookies and the user's IP address. Vitruvian Health thereby discloses to Google and Simpli.fi the specific type of healthcare service the user is exploring.

82. ***Location Searches:*** The Website allows users to search for clinic and hospital locations operated by Vitruvian Health. These user searches are shared in real time with third parties without the users' knowledge. When a

user searches for a specific location, such as the Bandy Endoscopy Center, the user's search and visit to the specific clinic page are intercepted and transmitted in real time to Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, and to Simpli.fi via the Simpli.fi Tracker, alongside the suid and uid_syncd_secure cookies and the user's IP address. Vitruvian Health thereby discloses to Google and Simpli.fi the specific facility at which the user is seeking care.

83. ***Free-Text Search Queries:*** Users may use the Website's general search bar to conduct free-text searches by clicking the magnifying glass in the top right corner of the page. These search queries are intercepted and transmitted to third parties without the users' knowledge.

84. When a user searches for "cancer" using the Website's search bar, the search query "cancer" contained in the search results URL is automatically intercepted and transmitted in real time to Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, and to Simpli.fi via the Simpli.fi Tracker, alongside the suid and uid_syncd_secure cookies and the user's IP address. When the user then clicks on a search result such as "Anal and Rectal Cancer," the URL of that page is likewise intercepted

and transmitted to Google and Simpli.fi alongside the same identifying cookies and the user's IP address. Vitruvian Health thereby discloses to Google and Simpli.fi the specific medical condition the user is researching.

85. ***Patient Portal (MyChart):*** A user's click on "Patient Portal" on the Website's homepage is shared with Google and Simpli.fi alongside unique identifying cookies. When a user clicks to access the Patient Portal, the fact that the user has visited the Vitruvian Health Patient Portal page is automatically intercepted and transmitted to Google via the Google Analytics Tracker, alongside the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies, and to Simpli.fi via the Simpli.fi Tracker, alongside the suid and uid_syncd_secure cookies and the user's IP address. This discloses to Google and Simpli.fi that the user is a patient or is seeking to access patient-specific services through Vitruvian Health.

86. ***Temporal Patterns and Behavioral Analysis:*** In addition to the content of searches and interactions, the Google Analytics Tracker and the Simpli.fi Tracker also collect timestamp data showing precisely when each interaction occurs. This temporal information reveals behavioral patterns about users' healthcare-seeking activities. The timestamp data enables Google

and Simpli.fi to determine: (a) the complete progression of users' journeys through the Website, revealing potential connections between provider searches, services viewed, and conditions researched; (b) the evolution of users' health journeys by tracking the sequence and timing of searches from initial inquiries to specific conditions to treatment options; (c) the urgency of users' health concerns based on search times; (d) the frequency and regularity of health-related searches, distinguishing between chronic condition management and acute health crises; (e) the duration users spend researching specific conditions, indicating their level of concern or the severity of their situation; and (f) patterns that may reveal work or life impacts of health conditions based on when searches occur.

87. The above information, combined with the Cookies, particularly if the user was logged into their Google account or signed into Chrome while accessing the Website, allows Google and Simpli.fi to identify the person who has submitted this information through the Website.

### *I. Defendant's Knowing Disclosure of Intercepted Electronic Communications to Google and Simpli.fi*

88. Google and Simpli.fi, through the Trackers, are the entities that intercept Website visitors' electronic communications. Plaintiff does not seek to hold Vitruvian Health liable as an interceptor, or on the theory that Vitruvian Health procured, aided, or abetted Google's or Simpli.fi's interceptions. Rather, Vitruvian Health is liable under the ECPA because it intentionally disclosed the contents of those communications to Google, Simpli.fi, and other persons, knowing or having reason to know that the information was obtained through the interception of electronic communications. 18 U.S.C. § 2511(1)(c).

89. Vitruvian Health made the affirmative decision to implement the Trackers on the Website. This implementation was a deliberate action requiring Defendant's web administrators to copy the Trackers' tracking codes and insert them into the Website's source code. Without Vitruvian Health's deliberate implementation of this code, Google and Simpli.fi would have no access to the electronic communications of visitors to Defendant's Website.

90. Vitruvian Health controls which pages of the Website contain the tracking code and could choose to exclude tracking from sensitive pages where

healthcare information is accessed or inputted, yet it has chosen to implement tracking across these sensitive areas of the Website. Defendant maintains complete control over the Website and has the ability to remove or modify the Trackers at any time. Its continued use of these Trackers represents an ongoing, deliberate choice to disclose the contents of Website visitors' communications to Google and Simpli.fi.

91. Vitruvian Health knows, or has reason to know, that the Website visitors' communications it discloses to Google and Simpli.fi are obtained through interception. Vitruvian Health selected, installed, and configured the Trackers; controls which pages, events, and parameters they transmit; and receives the intercepted contents back from Google and Simpli.fi in the form of analytics dashboards, reports, and event-level data. Vitruvian Health therefore knows both how the information is acquired—through the automatic, contemporaneous redirection of visitors' communications to Google and Simpli.fi while those communications are in transit to the Website—and that visitors have not consented to that acquisition. Once acquired, the data is stored, analyzed, and potentially combined by Google and Simpli.fi with other data in their possession.

92. Defendant receives direct benefits from implementing these Trackers, including detailed analytics about Website usage that inform its business and marketing decisions. These analytics are generated from, and return to Defendant, the contents of Website visitors' intercepted communications.

93. Upon information and belief, after receiving the contents of Website visitors' intercepted communications, Vitruvian Health intentionally disclosed and re-disclosed those contents to other persons and platforms, including to Google's advertising products (such as Google Ads), by linking its Google Analytics property to those products and enabling advertising features such as Google Signals, and to Simpli.fi's programmatic advertising platform, through Data Mapping, audience segments, and retargeting and conversion campaigns. These subsequent disclosures are separate from, and in addition to, Google's and Simpli.fi's initial interception of visitors' communications.

94. These were disclosures by Vitruvian Health, not merely acquisitions by, or independent acts of, Google or Simpli.fi. Vitruvian Health controls which communications, pages, events, parameters, and identifiers are transmitted; which tracking and advertising features are enabled; and

whether its analytics properties are connected to advertising platforms. The disclosures are the intended operation of systems that Vitruvian Health selected, configured, and manages—not accidental transmissions—and each constitutes an intentional disclosure of the contents of intercepted electronic communications in violation of 18 U.S.C. § 2511(1)(c).

### *J. Defendant's Failure to Obtain Prior and Specific Informed Consent for the Interception and Disclosure of Website Visitors' Communications*

95. Defendant fails to obtain prior, specific, and informed consent from Website users before disclosing the contents of their electronic communications to undisclosed third parties like Google and Simpli.fi, which intercept those communications, in violation of 18 U.S.C. § 2511(1)(c) of the ECPA.

96. When users first access the Website, Vitruvian Health presents them with a cookie consent banner stating: "We believe your data is your property and support your right to privacy and transparency. Select a Data Access Level and Duration to choose how we use and share your data." The banner offers three settings: "Private," "Balanced," and "Personalized." The "Private" setting states: "Highest level of privacy. Data accessed for necessary

basic operations only. Data shared with 3rd parties to ensure the site is secure and works on your device." The "Balanced" setting states: "Balanced experience. Data accessed for content personalization and site optimization. Data shared with 3rd parties may be used to track you and store your preferences for this site." The "Personalized" setting states: "Highest level of personalization. Data accessed to make ads and media more relevant. Data shared with 3rd parties may be use[d] to track you on this site and other sites you visit."

97. The "Private" and "Balanced" settings are each affirmatively misleading. The "Private" setting represents an express, unqualified limitation on data access, and confines the stated purpose of any third-party sharing to two narrow technical functions: security and device compatibility. Neither Google Analytics nor Simpli.fi serves either function; both are advertising and analytics platforms whose core business is behavioral profiling and targeted advertising. A user who selects "Private" has been told in clear terms that data sharing is restricted to the narrowest scope available, and the transmission of that user's health-related browsing activity to advertising platforms is directly contrary to that representation.

98. The "Balanced" setting is similarly misleading: "content personalization and site optimization" describes purely internal, site-specific functions, and the phrase "for this site" expressly limits the described scope of third-party tracking to the Website itself. In reality, both Google and Simpli.fi use data received from the Website to track users across unrelated websites, build longitudinal behavioral profiles, and deliver targeted advertising wholly unconnected to the Website.

99. The graduated structure of the banner compounds these misrepresentations, because it reserves all language about ads, media relevance, and cross-site tracking exclusively for the "Personalized" tier, creating a clear inference that users who select a more restrictive setting will not be subject to advertising-related data sharing. Yet even the "Personalized" setting, the only tier to reference advertising at all, does not disclose that users' searches for medical providers, medical specialties, healthcare services, clinic locations, or specific medical conditions are among the data transmitted to third-party advertising platforms alongside unique identifying cookies.

100. Despite these representations, and irrespective of the data-sharing setting selected, Vitruvian Health transmits users' health-related

browsing activity, along with unique identifying cookies, to Google and Simpli.fi in real time for purposes wholly unrelated to site security, basic operations, or site-specific preferences. Vitruvian Health's consent mechanism is therefore illusory, and no Website visitor, including those who affirmatively sought to restrict data sharing, has provided valid consent to the interception of their electronic communications by Google and Simpli.fi or to Vitruvian Health's disclosure of the contents of those communications.

101. Defendant has never obtained valid consent from Plaintiff or Class Members for the interception of their electronic communications by Google and Simpli.fi or for Defendant's disclosure of the contents of those communications.

## PLAINTIFF'S EXPERIENCES

102. Plaintiff Tod Davis has been a patient of Vitruvian Health for years and has used Defendant's Website regularly during the Class Period (defined below), including as recently as July 2026. Plaintiff Davis accessed the Website using various devices including his laptop computer, desktop computer, and Android mobile device. When accessing the Website, Plaintiff Davis used Google Chrome and Microsoft Edge browsers. At various times

during the Class Period, Plaintiff Davis accessed the Vitruvian Health Website in order to search for locations, search for doctors and medical professionals (including specialist practitioners in neurology, hematology, and oncology), search for treatments, schedule and attempt to schedule appointments, check test results, and receive treatment.

103. Unbeknownst to Plaintiff Davis, during each of these visits to the Website, Vitruvian Health had implemented Google and Simpli.fi tracking software on the Website, through which Google and Simpli.fi intercepted his search terms, clicks, and other interactions with the Website, and Vitruvian Health disclosed the contents of those communications to Google and Simpli.fi. This information created identifiable records of his healthcare interests without prior written consent. After providing this private information through the Website, Plaintiff Davis received targeted advertising relating to his health-related interactions with the Website.

104. At no time did Plaintiff consent to the interception of his sensitive medical information and electronic communications with Defendant through the Website by Google or Simpli.fi, or to Defendant's disclosure of such information to Google or Simpli.fi. Plaintiff reasonably expected that his

online communications with Defendant were solely between himself and Defendant and that such communications would not be transmitted to or disclosed to Google, Simpli.fi, or any other third party.

105. As a result of Vitruvian Health's conduct, Plaintiff has suffered harm, including invasion of privacy, loss of the economic value of his personal data, diminished trust in Vitruvian Health as a healthcare provider, and reluctance to use Vitruvian Health's Website for healthcare-related purposes in the future.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

106. Defendant's unauthorized disclosure of the contents of Website users' intercepted communications has caused actual harm to Plaintiff and Class Members in multiple ways.

107. *Invasion of Privacy:* Medical and health-related information about individuals is highly private, and its interception can result in significant embarrassment, stigma, and even discrimination. Plaintiff and Class Members have suffered an invasion of their privacy through the unauthorized interception and disclosure of their electronic communications and healthcare-related activities. The interception and disclosure of these communications

violated Plaintiff's and Class Members' reasonable expectation that their interactions with a healthcare provider would remain private.

108. *Loss of Data Value*: Plaintiff and Class Members have been deprived of the economic value of their personal data. In today's digital economy, personal data, especially health-related information, has significant commercial value.

109. In a 2014 report by the Federal Trade Commission, the agency detailed the value of user data, particularly health information, and found that data brokers sell data in sensitive categories for a premium.[14] The FTC subsequently brought a lawsuit against a data broker for selling location data regarding people who visit abortion clinics for approximately $160 for a week's worth of data.[15]

---

[14] Federal Trade Commission, *Data Brokers: A Call for Transparency and Accountability* (May 2014), https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf (last visited October 20, 2026).

[15] *See* Federal Trade Commission, *FTC Sues Kochava for Selling Data that Tracks People at Reproductive Health Clinics, Places of Worship, and Other Sensitive Locations* (Aug. 29, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other (last visited October 20, 2026).

110. For years, data harvesting has been one of the fastest-growing industries in the United States. Some companies even allow individuals to flip the script and sell their own personal data for a profit.[16]

111. The value of health data is well-known and has been reported on extensively in the news. For example, a 2017 article by Time Magazine titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" described the extensive market for health data and noted that the market for information was both lucrative and a significant risk to privacy.[17]

112. Due to the difficulty in obtaining health information, illegal markets also exist for such personal and sensitive information. NPR reported that health data can be "more expensive than stolen credit card numbers."[18]

---

[16] *See* Datacoup, *The personal data revolution*, https://datacoup.com/ ("Internet behemoths have made the quickest and largest fortunes in history on the backs of your personal data. . . . Those days are over. . . . Rather than the digital behemoths exploiting your data for their own economic gain, monetize your own valuable asset as you see fit.") (last visited October 20, 2026).

[17] *See* Adam Tanner, Time, "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited October 20, 2026).

[18] Aarti Shahani, NPR, *The Black Market For Stolen Health Care Data* (Feb. 13, 2015, 4:55 am), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-for-stolen-health-care-data (last visited October 20, 2026).

113. Plaintiff's and Class Members' private and personal data, including their protected health information, have a recognized monetary value. Defendant's unauthorized disclosure of this sensitive personal data to Google and Simpli.fi has deprived Plaintiff and Class Members of the economic value of their personal property without proper consideration and has resulted in Defendant unjustly enriching itself at the expense of Plaintiff and Class Members.

114. *Chilling Effect on Healthcare Communication:* Defendant's conduct has undermined patient trust and created a chilling effect on digital healthcare communications. Plaintiff and Class Members can no longer confidently use the Website to seek medical information, locate healthcare providers, research treatments, or manage their healthcare without fear that their activities are being intercepted by third parties.

115. *Risk of Further Use of Intercepted Data:* Once intercepted by Google and Simpli.fi, Plaintiff's and Class Members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future

harm. For example, Google may combine the health-related data it intercepts from Defendant's Website with data from its other services (such as Google Search, YouTube, or Gmail) to create detailed user profiles that include sensitive health information.

116. *Statutory Injury:* Independent of the above harms, Defendant's violation of the ECPA has caused Plaintiff and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## CLASS ACTION ALLEGATIONS

117. Plaintiff brings this action on behalf of himself individually and on behalf of all other persons similarly situated pursuant to Rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

118. The Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States who visited the Vitruvian Health Website pages on which trackers were installed within the applicable statute of limitations period (the "Class Period").
>
> Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) Google and

> Simpli.fi, their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members, and staff; and (e) any jurors assigned to this case.

119. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

120. *Numerosity*: The Class is so numerous that joinder of all members is impracticable. Vitruvian Health operates as the parent corporation for Hamilton Medical Center and other health-related entities, providing healthcare services across northwest Georgia and southeast Tennessee through multiple facilities including Hamilton Medical Center, Bradley Medical Center, physician practices, outpatient facilities, and other clinics. Upon information and belief, the Website receives hundreds of thousands of unique visitors each year, many of whom had their electronic communications intercepted by Google and Simpli.fi during the Class Period.

121. *Commonality and Predominance*: There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Defendant implemented the Trackers on the Website;

(b) Whether Google and Simpli.fi, through the Trackers, intercepted Website users' electronic communications;

(c) Whether Defendant intentionally disclosed the contents of Website users' electronic communications to Google and Simpli.fi, knowing or having reason to know that the information was obtained through interception;

(d) Whether Website users consented to the interception of their electronic communications or to Defendant's disclosure of their contents;

(e) Whether Defendant's conduct violated 18 U.S.C. § 2511(1)(c) of the ECPA;

(f) Whether Defendant's disclosure of Website users' electronic communications constitutes a breach of confidence;

(g) Whether Defendant's conduct constitutes an invasion of privacy;

(h) Whether Defendant has been unjustly enriched through its conduct;

(i) Whether Defendant breached an implied contract with Plaintiff and Class Members;

(j) Whether Plaintiff and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(k) Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to injunctive relief.

122. *Typicality:* Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and Class Members all visited the Website and had their electronic communications intercepted by Google and Simpli.fi and disclosed by Defendant to Google and Simpli.fi without their consent. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members and are based on the same legal theories.

123. *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

124. *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

125. *Injunctive Relief Appropriate*: Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I: VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT (18 U.S.C. §§ 2511(1)(c), 2520—INTENTIONAL DISCLOSURE OF INTERCEPTED COMMUNICATIONS)
### (On Behalf of Plaintiff and the Class)

126. Plaintiff incorporates paragraphs 1 through 125 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

127. The ECPA makes it unlawful for any person to "intentionally disclose[], or endeavor[] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." 18 U.S.C. § 2511(1)(c).

128. Plaintiff brings this Count against Vitruvian Health as the entity that disclosed the contents of Plaintiff's and Class Members' intercepted communications, under 18 U.S.C. § 2511(1)(c). The interceptors are Google and Simpli.fi. Plaintiff does not assert a claim against Vitruvian Health as an interceptor under 18 U.S.C. § 2511(1)(a), or on any theory that Vitruvian Health procured, aided, or abetted Google's or Simpli.fi's interceptions.

129. The ECPA protects both the sending and receipt of communications and provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA. 18 U.S.C. § 2520(a). Interception, disclosure, and use are separate and independent violations of the ECPA. See *Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009); *Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 169 (5th Cir. 2000).

130. The transmissions between Plaintiff and Class Members and the Website are "transfer[s] of signs, signals, writing, imagery, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce" and therefore constitute "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

131. The ECPA defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). The health information intercepted here, including provider searches and provider page visits, service selections, location searches, clicks

to access the Patient Portal, and free-text search queries for medical conditions, constitutes content under the ECPA.

132. The Trackers implemented by Defendant on the Website constitute "electronic, mechanical, or other device[s]" within the meaning of 18 U.S.C. § 2510(5) because they are specifically designed to intercept and acquire the contents of electronic communications between Website visitors and Defendant.

133. The ECPA defines "intercept" as the "aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). Google and Simpli.fi intercept Plaintiff's and Class Members' communications within the meaning of § 2510(4): through the Trackers, they acquire the contents of users' communications in real time, contemporaneously with their transmission and while the communications are in transit to Vitruvian Health's servers, before the communications enter electronic storage. Neither Google nor Simpli.fi is a party to, or an intended recipient of, Website visitors' communications with their healthcare provider.

134. Vitruvian Health intentionally disclosed the contents of Plaintiff's and Class Members' intercepted communications to Google and Simpli.fi and, upon information and belief, re-disclosed those contents to Google's and Simpli.fi's advertising products and platforms. Specifically: (a) Defendant made the affirmative decision to embed each Tracker's code into its Website and configured the Trackers to transmit visitors' provider searches, service selections, location searches, free-text search queries, Patient Portal clicks, and page URLs, together with the Cookies and IP addresses; (b) Defendant controls which pages, events, and parameters are transmitted and could have excluded the Trackers from pages where health information is communicated, but chose not to; (c) Defendant receives the intercepted contents back from Google and Simpli.fi through analytics dashboards, reports, and event-level data; and (d) upon information and belief, Defendant thereafter disclosed those contents to Google's and Simpli.fi's advertising products and platforms, including by linking its analytics to those products and by creating or activating audience segments and retargeting and conversion campaigns.

135. When Defendant disclosed these contents, it knew or had reason to know that the information was obtained through the interception of

electronic communications in violation of 18 U.S.C. § 2511(1). Defendant selected, installed, and configured the Trackers; knew that the Trackers acquire visitors' communications automatically and contemporaneously while those communications are in transit to the Website; could view the intercepted information through Google's and Simpli.fi's analytics and reporting tools; knew, including from the HHS Bulletin and the FTC and HHS warnings described above, that the information was protected health information; and knew that it had never obtained visitors' valid consent or HIPAA-compliant authorization. Defendant nevertheless continued to disclose the contents of visitors' communications to Google and Simpli.fi.

136. Plaintiff and Class Members had a reasonable expectation that their communications with a healthcare provider's website would remain confidential and would not be intercepted by third parties or disclosed by Defendant to third parties for commercial purposes.

137. Plaintiff and Class Members did not consent to Google's and Simpli.fi's interception of their communications or to Defendant's disclosure of the contents of those communications for advertising and analytics purposes.

138. Defendant was not acting under color of law, and no exception to ECPA liability applies. To the extent Defendant contends that Google's and Simpli.fi's interceptions were lawful under 18 U.S.C. § 2511(2)(d) because Defendant, as a party to the communications, consented to them, that exception does not apply because the communications were intercepted for the purpose of committing criminal and tortious acts independent of the interception itself—namely, the knowing disclosure of individually identifiable health information to third parties, for commercial advantage and marketing purposes, in violation of HIPAA, 42 U.S.C. § 1320d-6, which provides enhanced criminal penalties where the offense is committed with intent to use such information for commercial advantage; breach of confidence; and invasion of privacy.

139. As a direct result of Defendant's violations, Plaintiff and Class Members are entitled to: (a) the greater of actual damages or statutory damages of the greater of $100 a day for each day of violation or $10,000; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

## COUNT II: BREACH OF CONFIDENCE
## (On Behalf of Plaintiff and the Class)

140. Plaintiff incorporates paragraphs 1 through 125 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

141. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

142. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on the Website.

143. Contrary to its duties as a medical provider, Defendant installed Trackers to disclose and transmit Plaintiff's and Class Members' communications, including private health information, to Google and Simpli.fi.

144. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

145. As a direct and proximate result of Defendant's unauthorized disclosures, Plaintiff and Class Members were damaged, including but not limited to: invasion of privacy, loss of the value of their sensitive medical

information, loss of the benefit of their bargain with Defendant, and erosion of the essential confidential nature of the provider-patient relationship.

**COUNT III: INVASION OF PRIVACY—INTRUSION UPON SECLUSION**
**(On Behalf of Plaintiff and the Class)**

146. Plaintiff incorporates paragraphs 1 through 125 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

147. Georgia recognizes the common law tort of invasion of privacy, including the form known as intrusion upon seclusion. This privacy tort protects against intrusion upon a plaintiff's seclusion or solitude, or into his or her private affairs.

148. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant regarding their healthcare needs, medical conditions, and treatment preferences.

149. Defendant intentionally intruded upon the seclusion and private affairs of Plaintiff and Class Members by implementing the Trackers on the Website and thereby disclosing sensitive, personal health information to Google and Simpli.fi without proper authorization or consent.

150. Defendant's intrusion upon Plaintiff's and Class Members' private communications would be highly offensive to a reasonable person. Internet users have a reasonable expectation that their personally identifiable communications with healthcare providers' websites will remain private, particularly when those communications involve sensitive health-related matters, including searches for providers, care locations, and healthcare services, access to the Patient Portal, and research about medical conditions.

151. Defendant's intrusion was intentional, as it deliberately implemented the Trackers on the Website to capture user communications for its own business purposes.

152. As a direct and proximate result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered injury, including loss of their reasonable expectation of privacy and diminution in the value of their personal information.

153. Plaintiff and Class Members are entitled to damages, including compensatory and punitive damages, in an amount to be determined at trial.

**COUNT IV: UNJUST ENRICHMENT**
**(Pleaded in the Alternative to Count V,**
**on Behalf of Plaintiff and the Class)**

154. Plaintiff incorporates paragraphs 1 through 125 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

155. Defendant has received a benefit from Plaintiff and Class Members through the collection and disclosure of their valuable personal data via the Trackers.

156. By implementing the Trackers on the Website, Defendant has disclosed the contents of users' electronic communications to Google and Simpli.fi for business purposes, including marketing and advertising analytics, thereby enriching itself at the expense of Plaintiff and Class Members.

157. Defendant has retained this benefit under circumstances which make it inequitable to do so without payment of its value to Plaintiff and Class Members.

158. It would be unjust and inequitable to allow Defendant to retain the benefits of its unlawful conduct.

159. Plaintiff and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant through its wrongful conduct.

**COUNT V: BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

160. Plaintiff incorporates paragraphs 1 through 125 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

161. When Plaintiff and Class Members provided their sensitive medical information to Defendant through the Website, they entered into implied contracts pursuant to which Defendant agreed to safeguard and not disclose their sensitive medical information without consent.

162. In particular, Defendant presented Website users with a mechanism to select their preferred level of data sharing, including options represented as limiting third-party data access to basic operational or site-specific purposes. Users who selected these more restrictive settings, and saved their preferences, reasonably understood that Defendant had accepted those terms and would honor them. This interaction reinforced and gave

specificity to the implied contractual understanding that Defendant would not disclose users' sensitive health information to third-party advertising and analytics platforms.

163. Plaintiff and Class Members would not have entrusted Defendant with their sensitive medical information in the absence of an implied contract obligating Defendant not to disclose sensitive medical information without their consent.

164. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' sensitive medical information to Google and Simpli.fi without authorization.

165. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and on behalf of all other Class Members similarly situated, respectfully requests that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

(b) Declare that Defendant's actions, as described herein, violate the ECPA;

(c) Award Plaintiff and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiff and the Class statutory damages as provided by the ECPA;

(e) Award Plaintiff and the Class punitive damages;

(f) Award Plaintiff and the Class restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct;

(g) Grant the injunctive relief requested by Plaintiff, including, but not limited to, requiring Defendant to cease disclosing the contents of Website users' communications to third parties

without proper consent; destroy all user data intercepted through the Trackers; and implement appropriate safeguards to ensure the protection of Website users' privacy in the future;

(h) Award Plaintiff and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiff and the Class reasonable attorneys' fees and costs, pursuant to O.C.G.A. Section 13-6-11, and as otherwise allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

Dated: November 4, 2026

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson

Georgia Bar No. 725843
**GIBSON CONSUMER LAW GROUP, LLC**
4279 Roswell Road, Suite 208-108
Atlanta, GA 30342
Tel: 678-642-2503
marybeth@gibsonconsumerlawgroup.com

Katrina Carroll, Esq.*
**CARROLL SHAMBERG LLC**
200 N. LaSalle, Suite 1650
Chicago, IL 60601
Tel: (872) 215-6205
katrina@csclassactions.com

Don Bivens*
DON BIVENS, PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Tel: (602) 762-2661
don@donbivens.com

**pro hac vice forthcoming*

*Attorneys for Plaintiff and the Class*